948 F.2d 1288
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Anna A. ANGOTTI, Plaintiff-Appellant,
v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Defendant-Appellee.
 No. 91-1048.
 United States Court of Appeals, Sixth Circuit.
 Nov. 22, 1991.
 
 Before NATHANIEL R. JONES and SUHRHEINRICH, Circuit Judges, and WELLFORD, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 On December 26, 1989, plaintiff-appellant Anna Angotti filed a complaint in state court against State Farm Mutual Insurance Company alleging that State Farm had discharged her without just cause in violation of her employment contract. Predicated on diversity of citizenship, State Farm removed the action to United States District Court. On December 6, 1990, the district court granted State Farm's motion for summary judgment, finding that Angotti had offered no evidence indicating that her termination had been other than for just cause. For the reasons that follow, we affirm in part and reverse in part.
 
 
 2
 * In June of 1988, after the successful completion of State Farm's agent training program, Angotti accepted employment with State Farm as a "trainee agent," and subsequently executed an employment contract entitled the State Farm Trainee Agent Agreement ("Agreement"). The Agreement, a standard one for trainee agents, includes a number of provisions relating to the terms and conditions of employment. Part II(A) of the Agreement provides: "Your continued employment is contingent upon, among other things, your demonstration of: (1) ability to be trained and receive instruction, (2) ability to meet prospecting and production requirements, and (3) personal and professional development consistent with the requirements of the Trainee Agent Development Guide." J.A. at 166. The guide referred to in this section explains the requirements listed there more fully and provides that the trainee agent's supervisor must complete weekly progress reports of the trainee agent. Part V of the Agreement further provides: "Either you or the Company may terminate this Agreement by written notice delivered to the other or mailed to the other's last known address." J.A. at 167. Furthermore, the Agreement states that it "shall be the sole and entire employment agreement between [the parties]" and "supersedes and replaces any prior employment or agency agreement(s) with any of the State Farm Companies or all of them." J.A. at 166. Finally, the Agreement states that "no change, alteration or modification of this Agreement may be made except by written agreement between [the parties]." J.A. at 166.
 
 
 3
 In her initial meeting with Agency Director Lawrence LaPorte, Angotti recalls being told that her employment could be terminated "if production is not there" or for embezzlement. J.A. at 110. Angotti testified that based upon her understanding of the "[A]greement itself, and just by talking to other agents, [Agency Manager James] Luzod [and] Mr. LaPorte," she would not be terminated "unless they found proper causes." J.A. at 133. LaPorte, in answer to whether the items listed in Part II(A) constituted the only grounds for which one could be terminated, testified "[g]enerally speaking, yes." J.A. at 256.
 
 
 4
 Angotti began her employment in State Farm's Oak Park, Michigan office under the tutelage of agency manager Luzod. Angotti, like all other trainee agents, was assigned prospecting, production, and income goals by her agency manager. Angotti testified that she was led to believe that these were not strict requirements, but "a goal to strive for on a monthly basis." J.A. at 117. LaPorte also testified that the production goals were not mandatory minimums, and that it was not State Farm's policy to automatically terminate an employee for failure to meet the standards after a six- or twelve-month period.
 
 
 5
 In July of 1988, Charles Moran replaced Luzod as Angotti's agency manager. Thereafter began what Angotti described as a less than amicable relationship with Moran. Despite the fact that in February, 1989, Angotti secured the highest number of applications and the second highest volume in sales of life insurance in her district, Moran nevertheless recommended her termination. LaPorte denied the recommendation. Soon thereafter, Angotti met with LaPorte and told him of Moran's unfriendliness and hostility towards her. When she requested a transfer to another manager, LaPorte refused. Upon learning that Angotti had met with LaPorte, Moran made it clear to Angotti that he "did not care to be her friend" and "didn't appreciate [her having gone] to LaPorte one-on-one." J.A. at 149.
 
 
 6
 In June, 1989, Moran again recommended termination of Angotti's employment citing her inability to meet production goals. LaPorte accepted Moran's recommendation. In his review and acceptance of LaPorte's decision, Charles Trubac, Regional Vice President of State Farm, cited both Angotti's low production and Moran's opinion of her unwillingness to succeed as the grounds for her termination.[1]
 
 
 7
 While conceding that, by June of 1989, her performance had fallen somewhat below her assigned production requirements, Angotti contends that her figures remained well above those of many other similarly situated trainee agents whom State Farm did not terminate. According to Angotti's expert witness, Michael Thomson, Angotti's 1989 overall production figures missed her projected standards by 5.8%, while State Farm retained other trainee agents whose production fell beneath their respective production goals by as much as 74.4%. J.A. at 90-91.
 
 
 8
 Both parties agree that the production requirements did not establish a mandatory minimum that employees were required to meet to avoid automatic termination. Angotti claims, however, that so many trainee agents failed to meet their production requirements, and by so much more than she, that termination of her employment for failure to meet the goals did not constitute just cause, and asserts that Moran's personal animus may have motivated his decision to recommend her termination.
 
 
 9
 In granting summary judgment to State Farm, the district court made two findings. First, the court held that the Agreement, when read in its entirety, did not constitute an at-will employment contract, but rather required that termination of Angotti's employment be supported by just cause. Second, the court held that just cause existed in this case as a matter of law, reasoning that Angotti did not dispute that she failed to meet her production requirements, and had further failed to offer any evidence that State Farm "somehow thwarted her efforts to meet [the] requirements." J.A. at 22. In this appeal, Angotti challenges the court's finding that just cause existed as a matter of law, while State Farm contends that the court erred in finding that the agreement constituted a just-cause rather than an at-will contract.
 
 II
 
 10
 Our review of a district court's grant of summary judgment is de novo. Curry v. Vanguard Ins. Co., 923 F.2d 484, 485 (6th Cir.1991). With this in mind, we first consider State Farm's contention that the Agreement constituted an at-will contract of indefinite term rather than a just-cause employment contract.
 
 
 11
 The general rule of contractual construction in Michigan has long held that, "in the absence of a contractual basis for holding otherwise, either party to an employment contract for an indefinite term may terminate it at any time for any, or no, reason." Suchodolski v. Michigan Consol. Gas Co., 316 N.W.2d 710, 711 (Mich.1982). With the watershed case of Toussaint v. Blue Cross & Blue Shield, 292 N.W.2d 880 (Mich.1980), and its progeny, however, Michigan common law has been guided by the principle that "an employment contract providing that an employee would not be terminated except for cause [is] enforceable although no definite term of employment [is] stated." Valentine v. General Am. Credit Inc., 362 N.W.2d 628, 629 (Mich.1984). Toussaint rested its analysis in part on a distinction between an employer's express agreement to terminate for cause and statements of company policy and procedure to that effect. Toussaint, 292 N.W.2d at 890. This distinction has been reaffirmed in subsequent cases. See Bullock v. Automobile Club of Mich., 444 N.W.2d 114, 117-18 (Mich.1989), cert. denied, 110 S.Ct. 1118 (1990); In re Certified Questions, 443 N.W.2d 112, 114 (Mich.1989). As to both types of contracts, the Toussaint court noted that an employer remained free to "protect itself by entering into a written contract which explicitly provides that the employee serves at the pleasure or at the will of the employer or as long as his services are satisfactory to the employer." Toussaint, 292 N.W.2d at 891 n. 24.
 
 
 12
 In the instant case, both parties agree, and the district court assumed, that the Agreement itself definitively established the terms and conditions of Angotti's employment. The parties merely disagree as to whether the language of the Agreement created an at-will or just-cause employment relationship. Because the issue is one of straightforward contractual interpretation, the meaning of the Agreement's language is a question of law for the court. See Hawkins v. Smithson, 449 N.W.2d 676, 678 (Mich.Ct.App.1989). In addition, Michigan common law clearly establishes that, where an express contract exists, the court should not find an implied contract covering the same subject. De Haan's Estate v. De Haan's Estate, 134 N.W. 983, 985 (Mich.1912).
 
 
 13
 Both parties cite a plethora of cases allegedly supporting their contrary interpretations of the Agreement. These cases appear to us to fall into two rather distinct categories. In the first group are those cases in which the employer, following Toussaint's admonition that employers carefully articulate whether the contract is at-will, explicitly stated in the contract or company handbook that the employment was at the will of the parties or terminable at any time. See, e.g., Rowe v. Montgomery Ward & Co., 473 N.W.2d 268, 270 (Mich.1991) (company handbook provided that employment could "be terminated at any time with or without cause"); Scholz v. Montgomery Ward & Co., 468 N.W.2d 845 (Mich.1991) (employment may "be terminated at any time, with or without cause, and without previous notice"). In the second group are those cases in which the express contract (if one existed) was silent on the issue of termination, and oral assurances or company policies or practices led the court to find that the employment was terminable only upon a showing of just cause. See, e.g., Renny v. Port Huron Hosp., 398 N.W.2d 327 (Mich.1986); Toussaint, 292 N.W.2d 880 (Mich.1980). The latter cases also clarify that the words "just cause" have no talismanic significance, and that their absence is no bar to the court finding the existence of a just-cause contract. See, e.g., Diggs v. Pepsi-Cola Metro. Bottling Co., 861 F.2d at 918 (6th Cir.1988) ("That the promise did not include the magic words 'just cause' is not sufficient to justify excluding the case from Toussaint coverage.").
 
 
 14
 The contract entered into by the parties in the instant case contains two potentially contradictory provisions. Part II(A) provides that Angotti's "continued employment is contingent upon, among other things, your demonstration of: ... ability to meet prospecting and production requirements," suggesting a just cause employment relationship. Part V, on the other hand, states in relevant part that "[e]ither you or the Company may terminate this Agreement by written notice." Upon careful consideration, we conclude that the contract permitted termination only for just cause on the following grounds.
 
 
 15
 First, a just cause interpretation finds strong support in Renny, which involved a plaintiff whose employment contract explicitly referred to the company handbook for all of its policies. The handbook, in turn, stated that the employer had the "sole and exclusive right ... to hire, lay off, discipline, discharge, assign, transfer, and promote employees," Renny, 398 N.W.2d at 334, but also provided for an optional grievance procedure. Id. at 333. In holding that the handbook, taken as a whole, established a just cause employment relationship, the court reasoned that "any suggestion that the [defendant] could fire an employee at will despite the express statements in its handbook and without evidence of a policy change would imply that the handbook was a sham." Id. at 336. Similarly, a holding by this court that the Agreement at issue here established an at-will relationship would render meaningless the Agreement's provision that Angotti's continued employment was in any real sense contingent upon her production requirements. We decline to adopt a construction of the Agreement that would so blatantly disregard the express terms of a valid employment contract.
 
 
 16
 Second, Toussaint and its progeny rest upon the Michigan Supreme Court's policy determination that just-cause employment contracts play a vital and economically salutary role in contemporary workplace relations and may consequently give rise to legitimate employee expectations regarding job security. The Court in Toussaint explained this principle as follows:
 
 
 17
 While an employer need not establish personnel policies or practices, where an employer chooses to establish such policies and practices and makes them known to its employees, the employment relationship is presumably enhanced. The employer secures an orderly, cooperative and loyal work force, and the employee the peace of mind associated with job security and the conviction that he will be treated fairly.... It is enough that the employer chooses, presumably in its own interest, to create an environment in which the employee believes that, whatever the personnel policies and practices, they are established and official at any given time, purport to be fair, and are applied consistently and uniformly to each employee. The employer has then created a situation 'instinct with an obligation.'
 
 
 18
 Toussaint, 292 N.W.2d at 892. We are persuaded that these considerations militate in favor of finding a just-cause contract in the instant case as well. State Farm may fairly be said to have benefitted from the sense of job security that its contract engendered. Indeed, Angotti testified, and LaPorte did not deny, that Part II(A) of the Agreement was meant to instill in prospective employees a sense of the types of conduct that would place their jobs in jeopardy, and conversely, what conduct might reasonably be expected to better their chances of retaining their employment. Furthermore, we believe that a straightforward interpretation of Part V of the Agreement indicates that it pertains to how termination is to be effected, rather than the proper grounds for termination. A finding by this court that Part V established an at-will relationship would, we believe, run counter to Toussaint's exhortation that employers wishing to create at-will contracts state so explicitly and clearly, and moreover would effectively permit State Farm to reap the benefits of a just-cause contract without incurring the consequent obligations thereto. Therefore, we affirm the district court's finding that the Agreement established a just-cause employment relationship.
 
 III
 
 19
 In the second portion of its opinion, the district court concluded that State Farm had established the existence of just cause for Angotti's termination as a matter of law, reasoning that, "[c]onsidering this unambiguous language [in Part II(A) that Angotti's continued employment was contingent upon her ability to meet prospecting and production requirements] and Plaintiff's admission that she failed to meet the requirements, the Court has no choice but to conclude that the Plaintiff was terminated for just cause." J.A. at 22.
 
 
 20
 As an initial matter, this court has recently held that, under Michigan wrongful termination law, just cause constitutes an affirmative defense in which the burden of proof falls to the employer to show that cause in fact obtained in the particular case. Turner v. Allstate Ins. Co., 902 F.2d 1208 (6th Cir.1990); Johnson v. Jessop, 51 N.W.2d 915, 917 (Mich.1952). Therefore, where, as here, summary judgment has been granted in favor of the employer, the employer must prove on review that no reasonable jury could find, based on the evidence presented, that just cause did not exist. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255-56 (1986).
 
 
 21
 The Michigan Supreme Court has consistently held that the existence of just cause in a particular case is a question for the jury. See Renny, 398 N.W.2d at 335; Toussaint, 292 N.W.2d at 896. More specifically, whether an employer, under the facade of just cause, in fact terminated a plaintiff's employment on other grounds is a question of fact to be determined by a jury. See Toussaint, 292 N.W.2d at 896. Similarly, the selective enforcement of a company rule or policy may undermine the employer's contention that termination was for cause, and is likewise to be determined by the jury. Renny, 398 N.W.2d at 334; Toussaint, 292 N.W.2d at 897. As the court in Renny aptly summarized:
 
 
 22
 Where an employer has agreed to discharge an employee for just cause only, ... [t]he jury decides as a matter of fact whether the employee was discharged for cause. While the jury may not substitute its opinion for that of the employer's, it may determine whether the employee committed the specific misconduct for which he was fired, whether the firing was pretextual, whether the reason for discharge amounted to good cause, or whether the employer was selectively applying the rules. It is not enough that an employer acted in good faith or was not unreasonable.
 
 
 23
 Renny, 398 N.W.2d at 335.
 
 
 24
 In the instant case, Angotti testified that her termination for failure to meet her production quotas may have been pretextual, motivated in fact by Moran's personal antipathy towards her. Furthermore, Angotti offered unchallenged expert testimony suggesting that the "rule" that employees in her position who failed to meet their production requirements were terminated was selectively applied, and that State Farm retained a number of trainee agents with poorer results than Angotti. Based on our review of the record, we find that Angotti offered sufficient evidence on both of these issues to reasonably call into question whether her termination was for cause. Accordingly, we believe that Angotti must be given the opportunity to present her case to the jury.
 
 IV
 
 25
 For the foregoing reasons, we AFFIRM the district court's judgment that the Agreement established a just cause employment contract, REVERSE the court's grant of summary judgment to State Farm on the existence of just cause, and REMAND for further proceedings consistent with this opinion.
 
 WELLFORD, Senior Circuit Judge, dissenting:
 
 26
 There are two provisions in the contract between plaintiff Angotti and defendant State Farm Mutual Auto Insurance Company ("State Farm") that relate to whether the understanding amounted to an "at will" arrangement. Section II(A) provides:
 
 
 27
 Your continued employment is contingent upon, among other things, your demonstration of:
 
 
 28
 1. ability to be trained and receive instruction.
 
 
 29
 2. ability to meet prospecting and production requirements, and
 
 3. personal and professional development
 
 30
 consistent with the requirements of the Trainee Agent Development Guide.
 
 
 31
 (Emphasis added). Section V(A) sets out, in pertinent part: "Either you or the company may terminate this Agreement by written notice delivered to the other or mailed to the other's last known address."
 
 
 32
 The latter language in V(A) is clear, and without regard to whether II(A) is inconsistent, sets out an "at will" agreement. Cloverdale Equipment Company v. Swain Aerials, Inc., 869 F.2d 934, 936 (6th Cir.1989). Cloverdale involved other language in the termination section of the contract which permitted, on certain bases, immediate termination rather than the 60-day notice generally applicable to the contractual arrangement. We held the contract to be an "at will" contract. Michigan has recognized, after the landmark case of Toussaint v. Blue Cross & Blue Shield of Michigan, 408 Mich. 579, 292 N.W.2d 880, reh'g denied, 409 Mich. 1101 (1980), that "[a]bsent a contractual provision for job security, either the employer or the employee may ordinarily terminate an employment contract at any time for any, or no, reason." Valentine v. General American Credit, Inc., 420 Mich. 256, 258-59, 362 N.W.2d 628, 629 (1984).
 
 
 33
 Plaintiff asserted in her complaint that she was terminated without cause and claimed that State Farm gave her "reasonable and legitimate expectations of continued employment absent just cause," and that the "written Trainee Agent Agreement" and "Trainee Agent Development Guide" "constituted an explicit employment agreement." The district court granted State Farm's motion for summary judgment, concluding that there was a just cause basis for Angotti's termination. I would affirm the grant of summary judgment in this case, not only for the reasons stated by the district court, but also on the additional basis that the contract between the parties should be interpreted as an "at will" arrangement.
 
 
 34
 The language of part V(A) of the trainee agent agreement is clear that the agreement is intended to be an "at will" contract.
 
 
 35
 Either you or the Company may terminate this agreement by written notice delivered to the other or mailed to the other's last known address. No compensation of any kind shall accrue or become due hereunder after termination of this Agreement.
 
 
 36
 Nowhere in the agreement is there any use of the words, "for just cause," or any indication that termination may be for just cause only. It superseded any prior agreement, and no modification was permissible except in writing, thereby foreclosing any alleged oral or verbal understandings allegedly relied upon by Angotti. See Vitkauskas v. State Farm Mutual Auto. Ins., 509 N.E.2d 1385 (Ill.App.1987). Part II(A) designated certain activities or characteristics upon which continued employment as a trainee agent was "contingent": ability to receive instruction, ability to meet production requirements, and professional development, "among other things." I do not find this language inconsistent with or negating the later specific "at will" language.[1] It seems reasonable to this writer that special attention was being directed to these primary "abilities" and "developments" being sought in the training process. It made it clear to the prospective employee that unless these aims and requirements were met, the employee might expect to be terminated.
 
 
 37
 We have decided in other cases that specific bases for termination set out in an employment agreement are not antithetical to specific "at will" language therein. See Cloverdale Equipment Co., supra; Pratt v. Brown Mach. Co., 855 F.2d 1225 (6th Cir.1988); Reid v. Sears, Roebuck & Co., 790 F.2d 453 (6th Cir.1986). The contractual provision for notice did not transform this agreement from an "at will" arrangement. Duncan v. Rolm Mil-Spec Computers, 917 F.2d 261 (6th Cir.1990); Taylor v. General Motors Corp., 826 F.2d 452 (6th Cir.1987). Neither is the agreement precluded from being an "at will" arrangement by reason of the fact that supervisors considered part II(A) standards.
 
 
 38
 This is clearly not an agreement referred to in Toussaint that expressly calls for termination "only for cause." A Michigan Supreme Court decision amplifies this reasoning:
 
 
 39
 Employers are most assuredly free to enter into employment contracts terminable at will without assigning cause. We hold only that an employer's express agreement to terminate only for cause, or statements of company policy and procedure to that effect, can give rise to rights enforceable in contract.
 
 
 40
 Toussaint, 408 Mich. at 610, 292 N.W.2d at 890; see also Lynas v. Maxwell Farms, 279 Mich. 684, 273 N.W. 315 (1937).
 
 
 41
 Since I would interpret the agreement as being an "at will" contract, I would affirm the decision of the district court to grant State Farm summary judgment, but on different grounds than asserted by the district judge. Even if the agreement were deemed to set out a just cause basis for termination, however, I would still affirm the grant of summary judgment to defendant on this record.
 
 
 42
 [Employees] must be permitted to establish their own standards for job performance and to dismiss for non-adherence to those standards although another employer or the jury might have established lower standards.
 
 
 43
 An employer who agrees to discharge only for cause need not lower its standard of performance.
 
 
 44
 Toussaint, 408 Mich. at 623-24, 292 N.W.2d at 897. Thus, even if the agreement were deemed to be not an "at will" arrangement, State Farm could set its own standards for cause, even if these standards were high and constituted, in effect, meeting "satisfaction" goals set by its supervisors and managers during the training process. Assessing one's "ability to be trained and receive instructions," and "ability to meet prospecting ... requirements, and determining personal and professional development" are inherently subjective judgments. We recently decided a case involving such standards involving the effectiveness of an employee in explaining to customers the employer's product, also an inherently subjective analysis, and held the discharge to meet Michigan law requirements. Charles v. Pitney Bowes, No. 90-2344, 1991 WL 207552, 1991 U.S.App. LEXIS 24926 (6th Cir. 1991).
 
 
 45
 Toussaint analyzed the earlier case of Lynas as being a satisfaction contract--Lynas was employed until his services were deemed by the employer to be unsatisfactory. "The employer may discharge under a satisfaction contract so long as he is in good faith dissatisfied with the employee's performance or behavior." Toussaint, 408 Mich. at 622-23, 292 N.W.2d at 896. The question then under Michigan law is whether State Farm and its supervisors acted in good faith in evaluating Angotti's "ability" and her achievement as a trainee agent and finding them insufficient and unsatisfactory, apart from the question of her meeting production goals. Progress reports made during the course of Angotti's training would be some evidence of whether or not her abilities and achievements were adjudged to be acceptable by State Farm.
 
 
 46
 The district court found that Angotti did not meet the agreement's "prospecting and production requirements." I would find no clear error in this determination. The district court also found no merit in Angotti's contention that as to production goals, her failure in that regard was not as great as other trainees, and that there was discriminatory selective enforcement effected against her. Again, I would find no error in this conclusion because plaintiff asserted in her complaint no discrimination averment nor any estoppel claims against State Farm.
 
 
 47
 The majority decision notes that Angotti did "not dispute the accuracy" of the following data with regard to "minimum production standards":
 
 
 48
 Her minimum production goal is 15 fire apps. per month. Over one year, she has averaged 13.4. In life insurance, she was expected to write 58 and have at least 50 placed (one-time Millionaire Club). Anna has written 55 and as of May 31, placed 36.... In health insurance, her minimum goal was 58. She wrote 47 in auto, her minimum was 225. She wrote 218.
 
 
 49
 In addition, another manager (Moran), who "worked closely with Anna ... [was] of the firm opinion that Anna is unable or unwilling to assimilate the direction of success." Majority Opinion n. 1.
 
 
 50
 I would disagree with the majority that the burden is upon State Farm to prove the negative in respect to the agreement--that plaintiff displayed no ability to be trained or receive instruction or to meet prospect and production requirements, or to show no personal and professional development. Rather, I remain convinced that under these circumstances it is plaintiff who must establish that she did meet these requirements in order to prevail. See Turner v. Allstate Ins. Co., 902 F.2d 1208 (6th Cir.1990) (Wellford, J., dissenting). Plaintiff must, then, show if there is a "just cause" agreement that defendant failed to act in good faith in assessing and evaluating her ability and development under the agreement and that State Farm was guilty of selective enforcement of production goals. Specifically, also if material and relevant to the basic issue of an alleged no just cause discharge, plaintiff has the burden of proving each of the alleged failures of defendant to carry out "their own practices and procedures as alleged in paragraph 23 of the complaint." In short, plaintiff must demonstrate that there was a breach by State Farm of its agreement. She has not done so in this case.
 
 
 51
 For the reasons stated, and based on the recent Michigan Supreme Court decision in Rowe v. Montgomery Ward, 437 Mich. 627, 473 N.W.2d 268 (1991), I must dissent. Bearing on the issues herein discussed, the Michigan court observed:
 
 
 52
 the party bearing the burden of overcoming the presumption of employment at will must convince the court either that it should supply an omitted term or the circumstances are such that the jury should be permitted so to conclude."
 
 
 53
 ....
 
 
 54
 In Lynas, supra, p. 687, "plaintiff was offered a permanent position ... so long as his services were satisfactory to defendant." The Court held that a durational term was lacking and that the relationship was for an indefinite term and terminable at will.
 
 
 55
 Rowe, 437 Mich. at 638-39, 473 N.W.2d at 272, 278 (emphasis added).
 
 
 56
 Also, the court held in Rowe that neither Montgomery Ward's "Rules for Personal Conduct" nor its "disciplinary guidelines" transformed an essentially "at will" contract into a "just cause" arrangement.
 
 
 57
 For these reasons, I would affirm the grant of judgment to defendant State Farm.
 
 
 
 [1]
 Specifically, the grounds given by LaPorte and accepted Trubac were two-fold:
 
 
 [1]
 Agent's inability to meet minimum production standards. Her minimum production goal is 15 fire apps. per month. Over one year, she has averaged 13.4. In life insurance, she was expected to write 58 and have at least 50 placed. (one-time Millionaire Club). Anna has written 55 and as of May 31, placed 36. Of the 36 placed policies, we can identify 27 as being on her own family. In health insurance, her minimum goal was 58. She wrote 47 in auto, her minimum was 225. She wrote 218
 
 
 [2]
 Chuck Moran has worked closely with Anna since he was assigned to be her manager in August, 1988. He is of the firm opinion that Anna is unable or unwilling to assimilate the direction of success as he urges her to do
 J.A. at 237, Angotti disputes that 27 of the placed policies were with her own family. However, Angotti does not dispute the accuracy of the figures cited.
 
 
 [1]
 The trainee agent development graded referred to in the agreement did not address termination