Melvin **CHISOLM**, Plaintiff,

v.

**MICHIGAN AFSCME COUNCIL 25, Afscme Local 3451 and Willow Run Community School District, and Gayle Green and Peter Silveri, individually, Defendants.**

No. 01–CV–71312–DT.

United States District Court,
E.D. Michigan,
Southern Division.

July 24, 2002.

James M. Brady, David L. Ravid, Ravid Assoc., Southfield, MI, for plaintiff.

Bruce A. Miller. E. Lynise Bryant, Miller Cohen, Detroit, MI, for Michigan Council 25 American Federation of State, Coun-

ty and Mun. Employees, Amer. Federation of State, County and Municipal Employees Local 3451, defendants.

Donald J. Bonato, Roy H. Henley, Thrun, Maatsch, Lansing, MI, for Willow Run Community School Dist., Gayle Green, Peter Silveri, defendants.

**ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANT WILLOW RUN COMMUNITY SCHOOL DISTRICT'S, DEFENDANT GAYLE GREEN'S AND DEFENDANT PETER SILVERI'S MOTION FOR SUMMARY JUDGMENT; (2) GRANTING IN PART AND DENYING IN PART DEFENDANT MICHIGAN AFSCME COUNCIL 25'S AND AFSCME LOCAL 3451'S MOTION FOR SUMMARY JUDGMENT; AND (3) DECLINING TO EXERCISE SUPPLEMENTAL JURISDICTION, AND REMANDING PLAINTIFF'S REMAINING STATE LAW CLAIMS—COUNTS I AND II—TO THE WASHTENAW COUNTY CIRCUIT COURT PURSUANT TO 28 U.S.C. § 1367(C)**

BORMAN, District Judge.

Now before the Court is (1) Defendant Willow Run Community School District's, Defendant Gayle Green's and Defendant Peter Silveri's motion for summary judgment and (2) Defendant Michigan AFSCME Council 25's and AFSCME Local 3451's motion for summary judgment. The Court heard oral argument on July 12, 2002. Having considered the entire record, and for the reasons that follow, the Court GRANTS IN PART and DENIES IN PART Defendants' motions for summary judgment. Specifically, the Court GRANTS summary judgment with respect to Counts III—VII of Plaintiff's Complaint and DENIES summary judgment with respect to Counts I and II of Plaintiff's

Complaint. Furthermore, the Court, in its discretion, declines, pursuant to 28 U.S.C. § 1367(c), to exercise supplemental jurisdiction over Plaintiff's remaining state law claims, and REMANDS Counts I and II of Plaintiff's Complaint to the Washtenaw County Circuit Court.

## FACTS

Plaintiff, Melvin Chisolm is a former employee of Defendant Willow Run Community School District ("Willow Run"). Plaintiff filed the instant lawsuit against Willow Run, Gayle Green—Superintendent of the school district ("Green"), Peter Silveri—Director of Human Resources for the school district ("Silveri"), and the American Federation of State, County and Municipal Employees—Michigan Council 25 and Local 3451 ("Union Defendants"). Plaintiff's Complaint sets forth various claims arising from his termination of employment and his subsequent unsuccessful union grievance.

Plaintiff began working for the Willow Run school district as a custodian/groundskeeper in 1977. (Pl. Dep. at 16.) Plaintiff's responsibilities included keeping the premises clean, taking out the garbage, folding cafeteria tables, mowing the grass, shoveling snow away from school's entrances and buffing/scrubbing the floors. (*Id* at 18–24.) Approximately ten years later, in 1987, Plaintiff began suffering from a work related medical condition—carpel tunnel syndrome. (*Id.* at 26.) As a result, Plaintiff underwent surgery at some point during 1988 or 1989. (*Id.*) Plaintiff applied for and received workers' compensation benefits as a result of this injury. (Compl.¶ 16.)

Willow Run accommodated Plaintiff's medical restrictions by assigning Plaintiff to the position of bus aide in 1990. (Pl.'s Dep. at 27.) In this capacity, Plaintiff assisted with the transportation of handi-

capped students to different schools in the district. (*Id.* at 27–28.) Although the bus aide job was a lower paying position, Plaintiff was able to make up the pay differential through continued workers' compensation benefits. (*Id.* at 29.) After working as a bus aide for two years, Plaintiff was awarded a building monitor position at one of the middle schools. (*Id.* at 30; Pl's Resp. Br. Exh. 4.) Plaintiff's pay continued to be augmented by workers' compensation benefits. (Pl.'s Dep. at 53–54.)

In February 1998, Willow Run's workers' compensation insurance carrier requested that Plaintiff report for a physical examination with Dr. Steven Kushner.[1] (Willow Run's Br. Exh. 6—Feb. 10, 1998 Letter.) Plaintiff was permitted to have his own doctor at this examination. (*Id.*) The appointment was made in order to assess Plaintiff's continued carpal tunnel syndrome disability—Dr. Kushner was to determine whether continued restrictions were necessary, or whether Plaintiff could return to his previous custodial position. (*Id.*)

Dr. Kushner examined Plaintiff on March 12, 1998. (*Id.*—Mar. 19, 1998 Letter). He performed an EMG and a nerve conduction test. (*Id.*) Dr Kushner concluded that Plaintiff "should avoid vibratory tools and air motors in his left hand. He can wear splints bilaterally. He can take anti-inflammatory medication." (*Id.*) This information was communicated to Willow Run's Human Resource department on April 7, 1998. (*Id.*—April 7, 1998 Memo).

On August 21, 1998, Defendant Silveri sent Plaintiff a memorandum documenting Plaintiff's medical restrictions and reassigning Plaintiff to the afternoon custodial position at Willow Run High School, beginning August 26, 1999. (Union's Br. Exh. B.) The letter indicated that Plaintiff's duties would conform to the medical restrictions documented in the memorandum. (*Id.*)

Plaintiff alleges that before he returned to work, he hurt his ankle in a slip and fall accident at his home.[2] (Pl.'s Dep. at 49.) According to Plaintiff, the slip and fall injury occurred during August of 1998. (*Id.*) Plaintiff's short-term disability application indicates that the accident occurred on August 20, 1998. (Unions Br. Exh. D.) Plaintiff, however, did not seek treatment for the injury until August 27, 1998. (*Id.*)

On this same day, August 27, 1998, Plaintiff first returned to work. Plaintiff only remained on the job for approximately one hour. (Pl.'s Dep. at 91; Silveri Affidavit ¶ 8.) Plaintiff informed Todd LaPrairie, the Buildings and Grounds Supervisor, that he had injured his ankle at home, that it was hurting, and that he needed to go home. (Pl.'s Dep. at 82–83.)

On September 8, 1998, LaPrairie sent a memorandum to Plaintiff. (Willow Run's Br. Exh. 8.) The memo documented that Plaintiff failed to report to work on August 26, 1998 and only reported for one hour on August 27, 1998.[3] (*Id.*) The memo also reminded Plaintiff that he had promised to provide a doctors' excuse by August 31, 1998; no excuse, however, had been received by the district. (*Id.*) LaPrairie requested that appropriate medical docu-

---

1. Plaintiff acknowledged that Willow Run's workers' compensation carrier had not requested a medical examination for three or four years. (Pl.'s Dep. at 59.)

2. Specifically, Plaintiff alleges that he slip and fell on a wet deck.

3. The memo also indicated that Plaintiff worked for one hour on August 31, 1998. Plaintiff, however, does not remember working on this date. (Pl.'s Dep. at 91.)

mentation be submitted by September 14, 1998. (*Id.*)

Plaintiff apparently complied with the district's request—submitting a note from his treating physician, Dr. Mafee, indicating that Plaintiff suffered an "ankle injury" and was unable to work until further notice. (Willow Run's Br. Exh. 8; Pl.'s Dep. at 99–100.) This note was supplemented by Dr. Mafee's September 24, 1998 completion of the medical portion of Plaintiff's short-term disability application. (Willow Run's Br. Exh. 9.) Dr. Mafee indicated that he began treating Plaintiff for an injury to his right ankle on August 27, 1998. According to Dr. Mafee, Plaintiff would be unable to return to work for three or four weeks. (*Id.*)

On October 15, 1998, Mr. LaPrairie sent another certified letter to Plaintiff. (Union's Br. Exh. E.) Mr. LaPrairie documented that Plaintiff's short-term disability period had ended and that Plaintiff was to report to his position as custodian on October 19, 1998. (*Id.*) Plaintiff, however, did not report to work on this date.

This failure prompted another letter from the school district. On October 27, 1998, Defendant Silveri sent a certified letter to Plaintiff requesting his presence at a meeting on November 2, 1998 to discuss Plaintiff's employment status. (*Id.* Exh. F.) The meeting was attended by Plaintiff, Defendant Silveri, Mr. LaPrairie, and Mr. Silveri's secretary. (Silveri Affidavit ¶ 9.) After Plaintiff's medical history was reviewed, Silveri allegedly assured Plaintiff that the school district was willing to meet any reasonable work-related restriction. (*Id.*) Plaintiff informed Silveri that he was still recovering from his ankle injury and therefore, would be unable to return to work. (*Id.*) Thereafter, Plaintiff provided the school district with another doctors' note, this one dated December 24, 1998. The note indicated that Plaintiff needed surgery on his right ankle and

could not return to work for approximately six weeks. (Pl.'s Br. Exh. 1; Pl.'s Dep. at 117–18.)

According to Defendant Silveri, in early February 1999, Plaintiff continued to indicate that he was unable to return to work. (Silveri Affidavit ¶ 10.) It was around this time that Silveri received surveillance videotapes taken by a private investigator for the school district's workers' compensation insurance carrier. (*Id.* at ¶ 11.) The videotapes reveal the following:

- *Surveillance Videotape # 1 (December 11, 1998):* Plaintiff going about a daily routine, e.g., walking without significant difficulty, driving, standing and talking and getting in and out of his truck.

- *Surveillance Videotape # 2 (January 22, 1999 ):* Plaintiff walking in the snow without any outward sign of difficulty, Plaintiff standing and talking, Plaintiff kneeling down and picking up a sheet of metal/aluminum and carrying it in his right hand (multiple times), and Plaintiff shoveling large amounts of snow on his property.

- *Surveillance Videotape # 3 (February 10, 1999):* Plaintiff walking without any visible problem.

Based on the content of the surveillance videotapes and Plaintiff's continued absence from work since August 1998, Defendant Silveri set up a meeting with Plaintiff for April 15, 1999. (Silveri Affidavit ¶ 12; Union's Br. Exh. G.) The meeting was attended by Mr. Silveri and his secretary, Plaintiff, Mr. LaPrairie, and Union representatives Kathy Green and Kay Bentley. (Silveri Affidavit ¶ 12; Pl.'s Dep. at 108, 120–21.) According to Silveri, Plaintiff's medical history was reviewed once again, including unspecified inconsistencies concerning the source of Plaintiff's disability. (Silveri Affidavit ¶ 13.) Silveri alleges that Plaintiff, in response to direct questioning,

denied being able to shovel snow, and indicated that he could do nothing more than move paper across a desk. (*Id.* ¶ 14.) Silveri alleges that he then confronted Plaintiff with the video evidence. (*Id.* ¶ 15.) Plaintiff was terminated by Mr. Silveri for untruthful use of sick leave. (*Id.* ¶ 15–16.) Silveri claims that at the termination, Plaintiff got extremely angry, slamming his clipboard on the table, pounding his fists, and calling Mr. LaPrairie a liar; in fact, one of the union representatives was allegedly forced to restrain Plaintiff. (*Id.* ¶ 17, 19.) Mr. Silveri subsequently sent a letter to Plaintiff documenting the reasons for Plaintiff's termination. The letter indicated that Plaintiff was terminated for (1) abuse of sick leave policy and (2) misrepresenting the truth during the administration's investigation of suspected abuse of sick leave policy.[4] (Union's Br. Exh. H— Letter Dated April 20, 1999.)

Plaintiff's recollection of the meeting is largely consistent with that of Defendant Silveri. According to Plaintiff, Silveri bluntly asked Plaintiff what he could do at Willow Run. (Pl.'s Dep. at 121.) Plaintiff allegedly responded that once his ankle was healthy, he could perform any task; however, until that time, he could only perform desk work such as answering the phone or passing out checks. (*Id.* at 121–22.) After Silveri indicated that he had pictures of Plaintiff shoveling snow, Plaintiff acknowledged that he did shovel snow on one occasion because his wife could not get out and he could not afford to have someone else shovel his walkway. (*Id.* at 122–24.) Moreover, Plaintiff acknowledges that he became "quite upset" and "irrational" after being terminated—slamming his clipboard and being cut-off by one of the union representatives as he

approached Mr. LaPrairie.[5] (*Id.* at 125, 127–28.)

A grievance was filed on Plaintiff's behalf pursuant to the Collective Bargaining Agreement ("CBA")—Article 14 provides for a 5 step grievance process. Plaintiff's step four grievance was denied by the Superintendent of Willow Run, Defendant Green, on June 1, 1999. (Union's Br. Exh. K.) Pursuant to Step 5 of the grievance process, the Union had 10 working days thereafter to provide written notice of the Union's intent to arbitrate under Step 5. Written notice was provided by the Union on June 18, 1999. (*Id.* Exh. L.) Thereafter, the Union had twenty working days to file its appeal. On July 8, 1999, the Union submitted a written request seeking an extension: "AFSCME Local 3451 Willow Runs Chapter is asking for an extension on the Melvin Chisolm grievance, until July 20th." (*Id.* Exh. M.) The Union ultimately filed a demand for arbitration on August 16, 1999. The arbitrator dismissed the claim, deeming the August 16, 1999 filing to be untimely under the CBA. (Willow Run's Br. Exh. 15.)

Ultimately, on April 27, 1999, Plaintiff did have surgery on his ankle. (Pl.'s Resp. Br. Exh. 8.) The surgery was successful— Plaintiff's ankle healed from the surgery within two months. (Pl.'s Dep. at 52–53.) Plaintiff has not applied for any job since his termination. (Pl.'s Dep. at 167.) According to Plaintiff:

Its just, you know, you think of all the years you have on an employment somewhere. Then I think when you go somewhere else you start at the bottom of the list, it's just very difficult. I've had people call me and offer me. And I guess when times get hard—well, you

---

4. The letter also indicates that Plaintiff's post-termination outburst provided sufficient grounds for his termination.

5. At oral argument, counsel for the parties indicated that Plaintiff continued to receive workers' compensation benefits until the day he was terminated—April 15, 1999.

know, it's just hard to start all over somewhere. It's a lot of years, you know. It took me awhile to adapt to that I'm not with the district anymore. It's just very difficult.

(Pl.'s Dep. at 167–68.)

Plaintiff's Complaint alleges seven separate counts:

Count I: Breach of Collective Bargaining Agreement (Willow Run Community Schools)

Count II: Breach of Fair Representation (Union Defendants)

Count III: Public Policy Tort (Willow Run Community Schools, Green, Silveri)

Count IV: Gross Negligence (Green, Silveri)

Count V: § 1983 Due Process Claim—liberty and property interest (Willow Run Community Schools)

Count VI: § 1983 Due Process Claim—liberty and property interest (Green, Silveri)

Count VII: Intentional Infliction of Emotional Distress (All Defendants)

Defendants' motions for summary judgment are now before the Court.

## ANALYSIS

### A. Standard of Review

Pursuant to the Federal Rules of Civil Procedure, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." FED. R. CIV. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the non-moving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 (6th Cir.1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed.1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Id.; Feliciano v. City of Cleveland,* 988 F.2d 649, 654 (6th Cir.1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.,* 749 F.2d 1205, 1210–11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548 (1986). The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed.R.Civ.P. 56(e).

The rule requires the non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd Cty. Bd. of Ed.*, 106 F.3d 135, 145 (6th Cir.1997); *see also Anderson*, 477 U.S. at 252, 106 S.Ct. 2505 (holding that the non-moving party must produce more than a mere scintilla of evidence to survive summary judgment).

## B. Mitigation of Damages

The Willow Run Defendants first argue that summary judgment should be granted because Plaintiff failed to mitigate his damages. Defendants rely on the affidavit of James H. Dulebohn, Assistant Professor of Human Resources Management at Michigan State University. (Willow Run Br. Exh. 18.) Mr. Dulebohn examined unemployment statistics obtained from the United States Department of Labor. (*Id.*) He noted that the average rate of unemployment for the city of Ypsilanti and the county of Washtenaw—2.7% and 1.9% respectively—was significantly lower than the national average (3.7%) and the unemployment rate for the state of Michigan (4.1%). (*Id.*) He also noted that seventy percent of unemployed workers obtained employment within 14 weeks. Consequently, Mr. Dulebohn concluded that Plaintiff would most likely have obtained a job offer within 14 weeks of his termination.

Based on this fact, Defendants argue that summary judgment should be granted because Plaintiff has not sought new employment after his termination. According to the Defendants, Plaintiff's ankle surgery went well, (Pl.'s Dep. at 52), and Plaintiff acknowledged that he is in relatively good health with the exception of the restrictions caused by continued carpel tunnel syndrome. (*Id.* at 143–48.) The Court disagrees, finding that summary judgment is inappropriate based on Plaintiff's alleged failure to mitigate damages.

Mitigation of damages is a legal doctrine that seeks to minimize the economic harm arising from a wrongdoing. *Morris v. Clawson Tank Co.*, 459 Mich. 256, 263, 587 N.W.2d 253 (1998).

> In the context of an employment contract, wrongful discharge, or discriminatory firing, mitigation of damages obligates the victim of the wrongdoing to make reasonable efforts to find employment after discharge. The plaintiff's back-pay award, if he succeeds at trial, is then reduced by the amount that he earned in mitigation. Such a plaintiff may not purposefully remain unemployed or underemployed in order to maximize recoverable damages in the form of lost wages.

*Id.* at 264, 587 N.W.2d 253. Thus, if a plaintiff fails to make reasonable efforts to mitigate his damages, he loses the right to claim "full" back pay as damages. *Id.* The question of whether an employee was reasonable in "not seeking" or "accepting particular employment" is a question for the jury, not the court. *Id.*

In this case, Defendants' own witness indicated that Plaintiff was only likely to find employment within 14 weeks of termination. If a jury finds for Plaintiff, he may receive some amount of back-pay for this period, even if the jury accepts this testimony. Mitigation of subsequent damages due to Plaintiff's failure to seek employment after this date is a jury question—a jury must determine if Plaintiff's made reasonable efforts under the circumstances. Failure to mitigate in this case is a damages issue, not a liability issue. Consequently, Defendants' motion must be denied on this ground.

## C. Judicial Estoppel

Defendants contend that Plaintiff's claims are barred by the doctrine of judicial estoppel because Plaintiff has made "diametrically opposed" statements in this

matter and in his pending claim for Social Security disability benefits. Plaintiff applied for Social Security disability benefits on August 24, 2001. (Willow Run's Br. Exh. 10.) In the application, Plaintiff noted that he had carpel tunnel syndrome in his right wrist and had a right ankle injury. (*Id.*) Plaintiff noted that he had constant pain in his hand and wrist, and swelling and pain in his ankle. (*Id.*) The application indicated that these conditions "prevented [Plaintiff] from returning to work," beginning August 30, 1998. (*Id.*) At his deposition, however, Plaintiff testified that he was in relatively good health, with the exception of the restrictions caused by continued carpel tunnel syndrome. (*Id.* at 143–48.) Defendants argue, therefore, that Plaintiff's lawsuit is barred by the doctrine of judicial estoppel because he has made conflicting statements—"If tried, this case would quickly devolve into a debate over which of Plaintiff's conflicting statements were lies. Such a proceeding would denigrate judicial integrity, and be an unjustifiable waste of public resources." (Willow Run's Br. at 10.)

■ The Court finds that the doctrine of judicial estoppel does not bar Plaintiff's claims. The doctrine of judicial estoppel prevents a party from taking a position "inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding." *Teledyne Indus. v. N.L.R.B.*, 911 F.2d 1214, 1217 (6th Cir. 1990); *see also New Hampshire v. Maine*, 532 U.S. 742, 749, 750, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (judicial estoppel prevents a party from asserting a claim that is "clearly inconsistent" with a claim that the party has succeeded in persuading a court to accept in an earlier court proceeding); *Griffith v. Wal–Mart Stores, Inc.*, 135 F.3d 376, 380 (6th Cir.1998). Thus, if judicial estoppel was applicable in this case, it would prevent Plaintiff from claiming that

he was capable of returning to work in any capacity after August 30, 1998.

■ Judicial estoppel is utilized "to preserve 'the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship.'" *Browning v. Levy*, 283 F.3d 761, 776 (6th Cir.2002) (quoting *Teledyne*, 911 F.2d at 1218). Judicial estoppel prevents a party from "perver[ting] the judicial machinery" by prohibiting a party from "playing fast and loose with the courts." *Id.* (citation omitted). Accordingly, the doctrine of judicial estoppel bars a party from (1) asserting a position that is contrary to one that the party has asserted under oath in a prior proceeding, where (2) the prior court adopted the contrary position either as a preliminary matter or as a part of a final disposition. *Browning*, 283 F.3d at 775. Because judicial estoppel impinges upon the truth-seeking function of the court, it must be applied cautiously. *Teledyne*, 911 F.2d at 1218.

■ In this case, judicial estoppel is inapplicable. Plaintiff is not asserting a position that is contrary to one that he took when submitting his Social Security disability claim. The gravamen of Plaintiff's Complaint is that, prior to his termination date, Plaintiff was unable to return to work because of his ankle injury. This assertion is entirely consistent with Plaintiff's Social Security disability claim. Plaintiff's deposition testimony that he was in relative good health, subject of course to lingering affects of carpel tunnel syndrome, may be inconsistent with Plaintiff's application for continuing disability benefits and his current claim for continued back-pay damages. However, this alleged inconsistency does not dictate that Plaintiff's claims should be dismissed. Plaintiff's allegations in his Complaint are simply not at odds with his Social Security disability application. Evidence of the in-

consistency may be relevant for impeachment purposes and with respect to the amount of damages, if any, that Plaintiff is entitled to receive; it is not, however, a basis to dismiss Plaintiff's claims. *See Teledyne*, 911 F.2d at 1218 ("In the federal courts, we rely on impeachment during cross-examination to deter parties from contradicting their prior statements to the court.").

Furthermore, there is no indication that the Social Security Administration has accepted any position asserted by Plaintiff in his application for benefits. Defendants' motion indicates that Plaintiff's case is still pending. Absent acceptance, either as a preliminary matter or as part of a final disposition, judicial estoppel is simply not applicable. *Teledyne*, 911 F.2d at 1218–19.

■ Finally, Defendants' reliance on *DeVito v. Chicago Park District*, 270 F.3d 532 (7th Cir.2001) is misplaced. *DeVito* did not turn on the doctrine of judicial estoppel. *Id.* at 535 ("The doctrine of judicial estoppel is not strictly applicable here . . ."). Instead, *DeVito* applied the doctrine of equitable estoppel, which "prevents a litigant from repudiating a representation that has reasonably, foreseeably induced reliance by the person to who he made it." [6] *Id.* at 534–35. There, the plaintiff represented to the defendant in an internal park district appeal that his condition had not improved and he was incapable of working full time. The Seventh Circuit held that the plaintiff was equitably estopped in his subsequent ADA lawsuit from claiming that he was physically capable of working full-time because the park district was entitled to rely on the plaintiff's previous conflicting representations that were made during the internal park appeal. *Id.* at 535. In this case, Defendants are not claiming that they detrimentally relied on Plaintiff's representations in his Social Security disability application— Plaintiff was terminated more than two years prior to his disability application with the Social Security Administration. In fact, the Sixth Circuit has held that the receipt of Social Security disability benefits does not foreclose a subsequent claim under the ADA. *See Griffith v. Wal–Mart Stores, Inc.*, 135 F.3d 376 (6th Cir.1998); *Blanton v. Inco Alloys Int'l, Inc.*, 123 F.3d 916 (6th Cir.1997).

## D. § 1983 Claims for Violation of Due Process

Plaintiff's complaint, Counts V and VI, alleges that Defendant Willow Run and Defendants Green and Silveri deprived Plaintiff of liberty and property without due process of law in violation of the Fourteenth Amendment. Plaintiff alleges that Defendants Green and Silveri deprived him of his property interest in continued employment without due process of law. Plaintiff also alleges that the individual defendants deprived him of a liberty interest in the "freedom from harm to his good name, reputation, honor and integrity." (Compl.¶ 68, 69.) Finally Plaintiff alleges that these constitutional injuries resulted from the execution of the school district's policies or customs.

Title 42 U.S.C. § 1983 "provides a remedy for deprivations of rights secured by the Constitution and laws of the United

---

**6.** The Sixth Circuit distinguished equitable estoppel from judicial estoppel in *Teledyne*. 911 F.2d at 1220. While judicial estoppel protects the courts, equitable estoppel serves to protect litigants "from unscrupulous opponents who induce a litigant's reliance on a position, then reverse themselves to argue that they win under the opposite scenario."

*Id.* (citation omitted). Thus, to invoke equitable estoppel, a party must show that (1) he was an adverse party in the prior proceeding; (2) the party detrimentally relied on the opponent's prior position; and (3) the party would be prejudiced if the opponent changed positions. *Id.*

States" when the deprivation occurs under the color of state law. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). Plaintiff's complaint alleges procedural due process violations under the Fourteenth Amendment. "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendments protection of liberty and property." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). "[T]he range of interests protected by procedural due process is not infinite." *Id.* at 570, 92 S.Ct. 2701. In order to determine whether procedural due process requirements are required, courts must look to the nature of the interest at stake, i.e., whether the property or liberty interest is protected by the Fourteenth Amendment. *Id.* at 571, 92 S.Ct. 2701 (citing *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)).

### 1. Liberty Interest

According to the Supreme Court, liberty is broadly defined:

> It denotes not merely the freedom from bodily restraint, but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, to establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men.

*Roth*, 408 U.S. at 572, 92 S.Ct. 2701 (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)). As noted by the Fourth Circuit Court of Appeals, "[l]iberty interests in an employment context pertain not to the right to continue in a given job but rather to the freedom to seek another." *Morrash v. Strobel*, 842 F.2d 64, 68 (4th Cir.1987); *see*

*also Med Corp., Inc. v. City of Lima*, 296 F.3d 404, 413–14 (6th Cir.2002) (noting that the Supreme Court has suggested that a protected liberty interest may be implicated by certain injuries to a person's reputation and good name which threaten to restrain the individual's freedom to pursue business or employment opportunities).

The Supreme Court has subsequently narrowed the scope of its holding in *Roth*. In *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the Court held that injury to reputation alone is not a constitutionally protected liberty interest under the Fourteenth Amendment. In *Roth*, two police chiefs distributed a flyer to local merchants, listing individuals known to be active shoplifters. *Id.* at 694–95, 96 S.Ct. 1155. Mr. Roth, was included on the list, although the shoplifting charges against him were subsequently dismissed. *Id.* at 696, 96 S.Ct. 1155. The flyer ultimately came to the attention of Mr. Roth's employer-however, no adverse employment action was taken. *Id.* Mr. Roth filed suit under § 1983, alleging that the police officials actions inflicted a stigma to his reputation that would impair his future employment opportunities. *Id.* at 697, 96 S.Ct. 1155.

The court held that "reputation alone, apart from some more tangible interest[ ] such as employment, is [n]either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." *Id.* at 701, 96 S.Ct. 1155. The Court reviewed earlier Court decisions, noting that "procedural guarantees of the Fourteenth Amendment apply whenever the State seeks to remove or significantly alter [a] protected status. . . . In each of these cases, as a result of the state action complained of, a right or status previously recognized by state law was distinctly altered or extinguished." *Id.* at

710–11, 96 S.Ct. 1155. Thus, because no state law guaranteed present enjoyment of reputation alone, no constitutional deprivation of liberty existed.

■ In this case, Plaintiff merely alleges a violation to his reputation, honor, good name and integrity. However, injury to reputation alone is insufficient to invoke the procedural protections of the due process clause. Plaintiff has made no allegations that the Defendants published or disclosed any stigmatizing information that foreclosed his freedom to pursue gainful employment.[7] *Dean v. McWherter*, 70 F.3d 43, 45 (6th Cir.1995) (noting that freedom to pursue gainful employment is clearly a liberty interest deserving due process protections); *Joelson v. United States*, 86 F.3d 1413, 1420 (6th Cir.1996) ("To establish a deprivation of a protected liberty interest in the employment context, a plaintiff must demonstrate stigmatizing governmental action which so negatively affects his or her reputation that it effectively forecloses the opportunity to practice a chosen profession."). Thus, the Court must grant summary judgment with respect to Plaintiff's § 1983 claim for deprivation of a liberty interest without due process of law.

### 2. Property Interest

■ Plaintiff also alleges that the Defendants deprived him of a property interest in continued employment with the Willow Run school district. Assuming *arguendo*, that Plaintiff had a property interest protected by the Fourteenth Amendment,[8] summary judgment must still be granted in favor of Defendants.

Due process under the Fourth Amendment generally requires some sort of pre-deprivation hearing. *Leary v. Daeschner*, 228 F.3d 729, 742 (6th Cir.2000) (citation omitted). The Supreme Court has specifically held that a pretermination hearing is required for employees who can only be dismissed for cause. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542–44, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). The Court held, however, that the pretermination hearing "need not be elaborate"—the formality depends upon the importance of the interest and the nature of the subsequent proceedings. *Id.* at 545, 105 S.Ct. 1487; *Leary*, 228 F.3d at 742.

---

**7.** The Sixth Circuit recently clarified that five elements must be satisfied by a plaintiff in order to establish a deprivation of a protected liberty interest based upon an injury to one's reputation or good name.

First, the allegedly stigmatizing statements must be made in connection with "the loss of a governmental right, benefit, or entitlement". There is no constitutional liberty interest in one's reputation standing alone. Second, a plaintiff alleging an injury to a liberty interest must show that the defendant made defamatory statements "that [would] forclose[] his freedom to take advantage of other employment opportunities." Third, "the stigmatizing statements or charges must be made public." "Fourth, the plaintiff must claim that the charges made against him were false." And "[l]astly, the public dissemination must have been voluntary."

*Med Corp., Inc. v. City of Lima*, 296 F.3d 404, 413–14, (6th Cir.2002) (internal citations omitted).

**8.** Neither the Plaintiff nor the Defendants address whether Plaintiff had a property interest in continued employment. As a threshold matter, a court must determine whether Plaintiff has a property interest entitling him to due process protection. *Leary v. Daeschner*, 228 F.3d 729, 741 (6th Cir.2000). A contract, such as a collective bargaining agreement, may create a property interest in continued employment—e.g., a requirement that an employee may only be dismissed for cause. *Id.* at 741, 742. In this case, Article 8 of the CBA provides that seniority employees shall be dismissed only for "reasonable and stated causes." (Willow Run's Br. Exh. 13—Article 8.01000.)

In fact, a full evidentiary hearing is not required; the hearing must provide an initial check against mistaken decisions— "essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Loudermill*, 470 U.S. at 545–46, 105 S.Ct. 1487. Moreover, as noted by the Sixth Circuit: "[T]he sufficiency of predeprivation procedures may be considered in conjunction with the options for postdeprivation review; if elaborate procedures for postdeprivation review are in place, less elaborate predeprivation process may be required," *Leary*, 228 F.3d at 743. The essential requirements are notice and an opportunity to respond (either in person or in writing). *Loudermill*, 470 U.S. at 546, 105 S.Ct. 1487.

Consequently, the Sixth Circuit has held that prior to termination, an employee must be given oral or written notice of the charges against him, and explanation of the employer's evidence, and an opportunity to present his or her side of the story to the employer. *Buckner v. City of Highland Park*, 901 F.2d 491, 494 (6th Cir.1990) (citation omitted). "To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." *Loudermill*, 470 U.S. at 546, 105 S.Ct. 1487. In essence, the purpose of the pretermination meeting is to alert the employer to the existence of disputes so that the decision maker can make a more informed decision.[9] *Id.* at 543–44 n. 8, 105 S.Ct. 1487.

Plaintiff, in this case, makes no argument that his pretermination process was insufficient under *Loudermill*. At the time of his termination, Plaintiff had failed

to return to work for approximately eight months. During this time, several letters were sent to Plaintiff concerning his continued absence from work. In fact, Plaintiff had previously met with Mr. Silveri on November 2, 1998 to discuss his medical condition and employment status. Mr. Silveri's subsequent March 26, 1999 letter, which requested Plaintiff's presence on April 15, 1999, indicated that the meeting was being held to "discuss the status of [Plaintiff's] employment." (Union's Br. Exh. G.) The letter noted that disciplinary action may result from the meeting and accordingly, Plaintiff was entitled to union representation. (*Id.*) Clearly, the meeting was being held to discuss Plaintiff's continued medical absence—in fact, Plaintiff contacted the Union to make sure that he would have representation at the meeting. (Pl.'s Dep. at 119–120.)

The meeting was attended by Defendant Silveri, Plaintiff's supervisor, and two union representatives. Plaintiff received notice of the claims being made and still pictures of the surveillance conducted by Willow Run's workers' compensation insurance carrier. Most importantly, Plaintiff was given an opportunity to respond to the evidence and offer an explanation for the activity observed on the videotapes. Pursuant to *Loudermill* and its progeny, Plaintiff received sufficient pretermination due process under the Constitution. Furthermore, elaborate post-deprivation procedures were in place—the CBA provided for a five-step grievance process culminating in a hearing before a neutral arbitrator. Consequently, summary judgment must be granted with respect to Plaintiff's § 1983 claim for deprivation of a property interest without due process of law.

---

**9.** The Sixth Circuit has also held that an employee does not have a right to a pretermination hearing before a neutral and impartial decision maker—the right of reply before the official responsible for the discharge is sufficient. *Duchesne v. Williams*, 849 F.2d 1004, 1005 (6th Cir.1988).

## E. Breach of the Collective Bargaining Agreement and Breach of the Union's Duty of Fair Representation

■ Counts I (Breach of the Collective Bargaining Agreement) and II (Breach of the Union's Duty of Fair Representation) of Plaintiff's compliant are governed by the Michigan Public Employment Relations Act ("PERA"), MICH. COMP. LAWS ANN. § 423.201 et seq. The PERA was adopted by the Michigan legislature to regulate the labor relations between Michigan's public employers and employees.[10] *Grandville Municipal Executive Ass'n v. City of Grandville,* 453 Mich. 428, 432, 553 N.W.2d 917 (1996). A such, Plaintiff's hybrid claim alleging that Willow Run breached the collective bargaining agreement and the Union breached of its duty of fair representation is governed by the PERA. *Rogers v. Board of Education of the Buena Vista Schools,* 2 F.3d 163, 166 (6th Cir.1993); *see also Murad v. Professional and Administrative Union Local 1979,* 239 Mich.App. 538, 542, 609 N.W.2d 588 (2000) (noting that the plaintiff's duty of fair representation action, which involved a state university employee, was "clearly governed by the public employment relations act").

The PERA was modeled after the National Labor Relations Act. *Rogers,* 2 F.3d at 166; *Murad,* 239 Mich.App. at 542, 609 N.W.2d 588 (discussing *Demings v. City of Ecorse,* 423 Mich. 49, 56, 377 N.W.2d 275 (1985)). Consequently, Michigan courts rely upon analogous federal precedent when construing state labor claims. *Rogers,* 2 F.3d at 166 (citations omitted).

■ In order to prevail against either the employer or the union in hybrid claims, the employee must not only show that the discharge was contrary to the collective bargaining agreement, but also that the union breached its duty of fair representation. *DelCostello v. International Bd. of Teamsters,* 462 U.S. 151, 165, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983); *Ryan v. General Motors Corp.,* 929 F.2d 1105, 1109 (6th Cir.1989); *Knoke v. East Jackson Public School District,* 201 Mich.App. 480, 485, 488, 506 N.W.2d 878 (1993). Liability cannot attach to the school district or the union unless both prongs of this test are satisfied. *Roeder v. American Postal Workers Union,* 180 F.3d 733, 737 (6th Cir.1999); *O'Keefe v. Department of Social Services,* 162 Mich.App. 498, 508, 413 N.W.2d 32 (1987) ("It makes no difference whether the employee sues the union alone, the employer alone, each separately, or both together.").

The rationale for this rule is that the two constituent claims are interdependent—the first claim is anchored in the employers breach of the collective bargaining agreement, the second claim is anchored in the unions failure to properly represent him during the grievance process leading to arbitration. *Roeder,* 180 F.3d at 737. If the employee fails to prove that the employer breached the CBA, he will recover nothing from the union because the employee's grievance would have failed regardless of the unions breach of their duty of fair representation. *Vencl v. International Union of Operating Eng'rs, Local 18,* 137 F.3d 420 (6th Cir.1998).

---

**10.** "Section 2(2) of the NLRA excludes from the definition of employer 'any State or political subdivision thereof.' 29 U.S.C. § 152(2). The Supreme Court has held that an entity is exempt fro the NLRA if it is either '(1) created directly by the state, so as to constitute [a] department[ ] or administrative arm[ ] of the government, or (2) administered by individuals who are responsible to public officials or to the general electorate.' *NLRB v. Natural Gas Util. Dist.* 402 U.S. 600, 604–05, 91 S.Ct. 1746, 29 L.Ed.2d 206 (1971)." *Kentucky River Community Care, Inc. v. NLRB,* 193 F.3d 444, 450 (6th Cir.1999).

### 1. Breach of the Collective Bargaining Agreement

■ According to the Sixth Circuit, courts should look to the "plain meaning of the agreement" when determining whether a CBA was breached. *Roeder*, 180 F.3d at 737. Plaintiff contends that Willow Run breached Article 8 of the Collective Bargaining Agreement.[11] Article 8.01000 provides:

Dismissal and/or any other disciplinary action with respect to seniority employees shall be only for reasonable and stated causes with the employee having the right to defend themselves against any and all charges.

Defendants contend that it discharged Plaintiff because (1) Plaintiff abused the district's sick leave policy; and (2) Plaintiff misrepresented the truth during the administration's investigation of his suspected abuse of the sick leave policy. Plaintiff disagrees, contending that he did not abuse the sick leave policy or misrepresent the truth to the district. (Pl.'s Br. at 6.)

As noted above, Plaintiff could only be discharged for "reasonable" cause. Genuine issues of material fact remain in this case with respect to whether Plaintiff was, in fact, abusing the districts sick leave policy or misrepresenting the truth surrounding his medical condition. The Michigan Supreme Court has consistently held that the existence of cause in a particular case is a question for the jury. *Angotti v. State Farm Mutual Automobile Ins. Co.*, No. 91–1048, 1991 WL 244962, at *5 (6th

Cir. Nov.22, 1991) (Unpublished Opinion). The Michigan Supreme Court stated in *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 292 N.W.2d 880 (1980):

We all agree that where an employer has agreed to discharge an employee for cause only, its declaration that the employee was discharged for unsatisfactory work is subject to judicial review. The jury as trier of facts decides whether the employee was, in fact, discharged for unsatisfactory work. A promise to terminate employment for cause only would be illusory if the employer were permitted to be the sole judge and final arbiter of the propriety of the discharge. There must be some review of the employer's decision if the cause contract is to be distinguished from the satisfaction contract.

The role of the jury will differ with each case. Where the employer claims that the employee was discharged for specific misconduct-intoxication, dishonesty, insubordination-and the employee claims that he did not commit the misconduct alleged, the question is one of fact for the jury: . did the employee do what the employer said he did?

*Id.* at 621, 292 N.W.2d 880; *see also Renny v. Port Huron Hosp.* 427 Mich. 415, 429, 398 N.W.2d 327 (1986); *Snell v. UACC Midwest, Inc.*, 194 Mich.App. 511, 515, 487 N.W.2d 772 (1992).

---

**11.** Plaintiff also asserts that Willow Run violated Article 6 of the CBA. Article 6.03000 provides:

Management may transfer an employee within a classification for just cause after reviewing with the Union and subject to the prior taking by management of corrective measures such as counseling and conferring with the employee involved as well as other progressive disciplinary measures. Such transfer shall be made only after there

has been counseling and conferring with the employee and attempts at progressive discipline have proven unsuccessful.

Article 6 is inapplicable in this case. Plaintiff was merely reassigned to his previous custodial position after Willow Run received notice that Plaintiff's medical restrictions no longer required that he be accommodated in a different position. The reassignment was unrelated to any conduct which required corrective measures or progressive discipline.

In this case, Plaintiff claims that he did not commit the alleged misconduct. Plaintiff provided the school district with several notes from his treating physician, Dr. Mafee, that he had injured his ankle and was unable to return to his custodial position. In fact, Plaintiff's physician scheduled ankle surgery on April 19, 1999, only days after Willow Run terminated Plaintiff; surgery was actually performed on April 27, 1999. Plaintiff acknowledges that he shoveled snow on one occasion; Plaintiff contends, however, that this was an isolated incident which does not equate to being able to work an eight hour day "shoveling snow, moving furniture, lifting 55 gallon cans filled with garbage and operating large floor stripping and buffing machinery." (Pl.'s Resp. Br. at 6). Thus, genuine issues remain whether Plaintiff was in fact abusing the sick leave policy and misrepresenting the extent of his injuries—the ultimate fact-finder may or may not agree with Defendant Silveri's discretionary conclusion. It is not the court's role to choose between two reasonable inferences on a motion for summary judgment.

### 2. Breach of the Union's Duty of Fair Representation

██ A union breaches its duty of fair representation if its conduct in representing the plaintiff was "arbitrary, discriminatory, or in bad faith." *Roeder*, 180 F.3d at 737; *Silbert v. Lakeview Educ. Ass'n, Inc.*, 187 Mich.App. 21, 25, 466 N.W.2d 333 (1991). Mere negligence is insufficient— liability will only attach if the union's conduct is " 'so far outside a wide range of reasonableness as to be irrational.' " *Roeder*, 180 F.3d at 737 (citation omitted). In this case, Plaintiff contends that the Union's untimely filing of his grievance amounts to arbitrary conduct.

Two Sixth Circuit cases are relevant to the Court's inquiry—*Vencl v. International Union of Operating Engineers, Local*

*18*, 137 F.3d 420 (6th Cir.1998) and *Ruzicka v. General Motors Corp.*, 649 F.2d 1207 (6th Cir.1981) [hereinafter *"Ruzicka II"*]. Both decisions involve the untimely filing of a grievance by the plaintiff's union. The court held: "absent justification or excuse, a union's negligent failure to take a basic and required step, unrelated to the merits of the grievance, is a clear example of arbitrary and perfunctory conduct which amounts to unfair representation." *Ruzicka II*, 649 F.2d at 1211; *see also Vencl*, 137 F.3d at 426. "*Ruzicka II* excuses only reasoned conduct, not irresponsible inattention." *Vencl*, 137 F.3d at 426.

In *Vencl*, the court held that the union failed to offer a reasonable excuse to justify its untimely filing. There, the notice of arbitration was filed one day late because the union's business representative was on vacation. *Id.*

On the other hand, in *Ruzicka II*, the union claimed that it failed to timely file the required statement in reliance on the prevailing practice of freely granting extensions of time for the exchange of grievance statements. *Ruzicka II*, 649 F.2d at 1210–11. The court remanded the case because of the record was incomplete. *Id.* at 1211. The court stated however:

> If the district court concludes that the bargaining representative's failure to timely file the grievance statement was due to reliance on the prevailing practice of freely granted extensions, that will be sufficient to relieve the union from liability. Such conduct does not amount to the arbitrariness which Ruzicka I held will constitute a breach of the duty of fair representation. Nor does it amount to the perfunctory calculation of a "non-grievance" as in *Williams v. Teamsters Local Union No. 984*, 625 F.2d 138 (6th Cir.1980). Concomitantly, it does not equal the inept handling of a grievance by a union igno-

rant of the contract provisions relevant to the case as in *Milstead v. International Brotherhood of Teamsters*, 580 F.2d 232 (6th Cir.1978). In relying on a past practice, a union's omission is based on a wholly relevant consideration, is not intended to harm its member, and is not the type of arbitrariness which reflects reckless disregard for the rights of the individual employee. Such conduct, at times, manifests no more than ordinary negligence and we cannot hold a union liable for breach of the duty of fair representation based upon simple negligence.

*Id.* at 1211–12.

■ In this case, taking the facts in a light most favorable to Plaintiff, the Union's conduct more closely resembles "irresponsible inattention"—i.e., unexplained union inaction described in *Ruzicka II* and found in *Vencl.* According to Article 14.06510 of the CBA, the Union had 10 working days after the Step 4 decision was reached to notify the employer, in writing, of its intent to arbitrate Plaintiff's grievance. Defendant Green denied Plaintiff's step 4 grievance on June 1, 1999. Accordingly, the Union had until June 15—ten working days—to file written notice of an intent to arbitrate. Actual written notice was not tendered until June 18, 2002, three days after the deadline. The Union has offered no explanation for its failure to timely file written notice.

Furthermore, assuming *arguendo*, that the Union's June 18, 1999 notice was timely, genuine issues still remain. Article 14.06510 provides that Union must file its appeal with the American Arbitration Association and with the Superintendent of Schools within 20 working days after written notification is given. Twenty working days from June 18, 1999 is July 19, 1999. Plaintiff's appeal was not filed until August 16, 1999, almost one month after this date.

The Union argues, however, that its untimely filing on August 16, 1999 was not arbitrary. On July 8, 1999, the Union requested an extension. The memorandum, sent to Defendant Silveri, states:

AFSCME Local 3451 Willow Run's Chapter is asking for an extension on the Melvin Chisolm grievance, until July 20th. Thank you in advance.

(Union's Br. Exh. M.) Although written approval for this extension was never received by the Union, either orally or in writing, the Union claims that it was relying on the fact that Willow Run allegedly had never denied a request for an extension—i.e., it believed in good faith that the extension would be granted. (Union's Br. Exh. O—Affidavit of Kathryn Green; Union's Reply Br. at 4.) Furthermore, although the memorandum merely requested an "extension ... until July 20th," the Union contends that it interpreted this request as re-starting the 20 day time period provided in Article 14.06510.

The record is devoid of any evidence, however, which would indicate that, in the past, the school district granted requested extensions by remaining totally silent. The affidavit of Kathryn Green merely states that Willow Run had previously granted extensions that were not in writing—i.e., as noted by the Union Defendants' counsel at oral argument, oral extensions had allegedly been granted in the past. (Willow Run's Br. Exh. O.) Thus, there is nothing in the record which would indicate that there was a past practice of granting extensions by remaining silent.

More importantly, the clear and unambiguous language of the memorandum merely requested an "extension ... *until* July 20, 1999." The Union argues, instead, that this request somehow renewed the twenty-day time period defined in the CBA. Thus, the Union Defendants not only rely on the aforementioned "past practice,"

but also upon an interpretation of the extension that is entirely inconsistent with the clear language contained on the face of the written request. If this strained interpretation is rejected by the jury, the Court concludes that a reasonable jury could find that the Union's filing, almost a month late, was not mere ordinary negligence, but irresponsible inattention to a basic and required step. This is buttressed by the fact that the Union has offered no evidence that it ever attempted to confirm that the extension was granted, or that it attempted to clarify its strained interpretation of its requested extension with anyone at Willow Run. As such, the Court concludes that genuine issues of material fact remain as to whether the Union breached its duty of fair representation.

### 3. Statute of Limitations

Finally, the Union argues that Plaintiff's hybrid claim is barred by the sixth month statute of limitations for claims based upon a union's breach of its duty of fair representation. The Court disagrees.

■■■■■■ A six-month statute of limitations is applicable to claims of breach of a union's duty of fair representation under the PERA. *Silbert v. Lakeview Educ. Ass'n*, 187 Mich.App. 21, 25, 466 N.W.2d 333 (1991). However, exhaustion of internal union grievance procedures must occur before a claim may be maintained by an employee against a union for breach of fair representation or against an employer for breach of a collective bargaining agreement. *Murad v. Professional and Administrative Union Local 1979*, 239 Mich.App. 538, 609 N.W.2d 588 (2000); *see also Rogers*, 2 F.3d at 166. Consequently, the statute of limitations is equitably tolled while the employee pursues his or her union grievance procedures. *AFSCME v. Board of Educ. of the Sch. Dist. of the City of Highland Park*, 457 Mich. 74, 90, 577 N.W.2d 79 (1998) ("Therefore, where the

language of a contract expressly states that a grievance shall be handled in a particular manner, we would allow the statute of limitations to be tolled while the union or employee is exhausting that mandatory procedure, regardless of whether the result is nonbinding."); *Silbert*, 187 Mich.App. at 25, 466 N.W.2d 333. The arbitrator's ruling in this case is dated August 30, 2000. Plaintiff's Complaint in this case was filed on February 20, 2001 and thus was filed in a timely manner.

Accordingly, because genuine issues of material fact remain with respect to whether Willow Run breached the CBA, and with respect to whether the Union Defendants breached their duty of fair representation, summary judgment is inappropriate with respect to Counts I and II of Plaintiff's Complaint.

### F. Retaliatory Discharge—MCLA 418.301(11)

■■■■ Count III of Plaintiff's Complaint alleges that Willow Run and Defendants Green and Silveri wrongfully discharged Plaintiff for seeking workers' compensation benefits. Section 418.301(11) of the Michigan Compiled Laws provides:

A person shall not discharge an employee or in any manner discriminate against an employee because the employee filed a complaint or instituted or caused to be instituted a proceeding under this act or because of the exercise by the employee on behalf of himself or herself or others of a right afforded by this act.

MICH. COMP. LAWS ANN. § 418.301(11). In order to establish a prima facie case of retaliatory discharge, Plaintiff must prove that (1) he asserted his right to workers' compensation benefits; (2) the Defendants knew that Plaintiff asserted his right to workers' compensation benefits; (3) the Defendants terminated Plaintiff; and (4) there was a causal connection between Plaintiff's assertion of his right to workers'

compensation benefits and his termination. *Chiles v. Machine Shop, Inc.*, 238 Mich. App. 462, 470, 606 N.W.2d 398 (1999) (discussing *DeFlaviis v. Lord & Taylor, Inc.*, 223 Mich.App. 432, 436, 566 N.W.2d 661 (1997)).

The *McDonnell Douglas* burden shifting approach applies to workers' compensation retaliation claims. *Chiles*, 238 Mich.App. at 470, 606 N.W.2d 398. Once a plaintiff establishes a prima facie case, the *McDonnell Douglas* approach shifts the burden to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Carden*, 156 Mich.App. at 211, 401 N.W.2d 273. Once the defendant has met this burden of production, the plaintiff "must be afforded the 'opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097 (citation omitted).

Plaintiff bears the burden of establishing a causal connection between the protected activity, i.e., the filing of a workers' compensation claim, and the adverse employment action. *Chiles*, 238 Mich.App. at 470, 606 N.W.2d 398. Plaintiff argues that it can be inferred that Willow Run terminated his employment to avoid making further workers' compensation payments because (1) a secretary seemed annoyed at having to fax Plaintiff's check stubs to Willow Run's workers' compensation carrier; and (2) Plaintiff's ankle injury was real not fictional i.e., Defendants' reasons were a pretext for discrimination. (Pl.'s Br. at 13–14.)

In this case, Plaintiff has failed to establish a causal connection. Plaintiff began receiving workers' compensation benefits for a work related medical condition, carpel tunnel syndrome, in 1990. Plaintiff continued to receive these benefits for approximately nine years, until his termination on April 15, 1999. Plaintiff's workers' compensation benefits were never terminated, or even questioned, during this entire time-period—Plaintiff even continued to receive workers' compensation benefits while on sick leave due to his alleged ankle injury.[12]

Significantly, Plaintiff claimed that he could not return to work in August 1998 because he suffered an ankle injury which allegedly occurred at Plaintiff's home—an injury for which workers' compensations benefits were unavailable (Plaintiff's medical documentation during his sick leave only referenced his alleged ankle injury). Plaintiff was not immediately terminated. Instead, Plaintiff remained on sick-leave for approximately eight months. Plaintiff continued to receive workers' compensation benefits during this entire time-period. During this time, the evidence indicates that the sole dispute between Plaintiff and Willow Run concerned the extent of Plaintiff's alleged ankle injury—Plaintiff's claim for continued sick leave only referenced his ankle injury and Plaintiff was only terminated after surveillance videos called these injuries into question. Thus, the uncontradicted evidence indicates that Plaintiff was terminated because of a difference of opinion solely with respect to Plaintiff's ankle injury and his refusal to return to work after eight months. This is not a case in which the timing of Plaintiff's discharge raises suspicion—Plaintiff continu-

---

**12.** Prior to oral argument, the record before the Court was unclear as to when Plaintiff's workers' compensation benefits terminated. Counsel for the parties clarified at oral argu-

ment that Plaintiff continued to receive workers' compensation benefits until his official termination on April 15, 1999.

ously received workers' compensation benefits for approximately nine years, during which time his right to benefits was never disputed by Willow Run. Plaintiff was only terminated after a dispute arose concerning his continued absence due to his claimed ankle injuryan injury for which workers' compensation benefits were unavailable. The mere alleged annoyance of the secretary responsible for faxing Plaintiff's records to the insurance carrier is insufficient to create a genuine issue of material fact. As such, the Court concludes that summary judgment is appropriate with respect to Count III.

### G. Gross Negligence

Count IV of Plaintiff's Complaint alleges gross negligence against Defendants Green and Silveri. Plaintiff's Brief in Response to Defendants' motion for summary judgment did not address the gross negligence claim. At oral argument, counsel for Plaintiff indicated that Plaintiff was abandoning this claim. As such, summary judgment is GRANTED with respect to Count IV—gross negligence.

### H. Intentional Infliction of Emotional Distress

■ In order to establish a prime facie case of intentional infliction of emotional distress under Michigan law, a plaintiff must establish (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation and (4) severe emotional distress. *Watkins v. City of Southfield*, 221 F.3d 883, 890 (6th Cir.2000) (citing *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 374 N.W.2d 905 (1985)); *Haverbush v. Powelson*, 217 Mich.App. 228, 233–34, 551 N.W.2d 206 (1996).

In order for conduct to be "extreme and outrageous" Michigan courts have noted: "It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been charac-

terized by 'malice', or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible grounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.... The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."

*Margita v. Diamond Mortgage Corp.*, 159 Mich.App. 181, 188, 406 N.W.2d 268 (1987) (quoting Restatement Torts 2d, § 46, comment g, at 76); *see also Corley*, 246 Mich. App. at 25, 632 N.W.2d 147.

■ Consistent with the analysis *supra*, the facts, even taken in a light most favorable to Plaintiff, do not rise to the level of extreme and outrageous conduct under Michigan law. This case involves a run-of-the-mill wrongful discharge/unfair representation lawsuit. Summary judgment on Count VII must be granted in Defendants' favor.

### I. Remand Pursuant to 28 U.S.C. § 1367(c)(3)

■ Having determined that summary judgment should be granted with respect to Counts III—VII, only Plaintiff's hybrid breach of the collective bargaining agreement/breach of fair representation claim remains before the Court (Counts I and II). As noted *supra*, these claims are governed by the Michigan Public Employment Relations Act ("PERA"), MICH. COMP. LAWS ANN. § 423.201 et seq. The Court declines to exercise supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367(c). The statute provides: "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . (3)

the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c).

"A district court has broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims." *Musson Theatrical, Inc. v. Federal Express Corp.*, 89 F.3d 1244, 1254 (6th Cir.1996) (citation omitted). "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Id.* at 1254–55 (citing *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)); *see also Brandenburg v. Housing Authority of Irvine*, 253 F.3d 891, 900 (6th Cir.2001) ("In fact, the usual course is for the district court to dismiss state-law claims without prejudice if all federal claims are disposed of on summary judgment."); *Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1412 (6th Cir.1991) (noting that only "overwhelming interests in judicial economy may allow a district court to properly exercise its discretion and decide a pendent state claim even if the federal claim has been dismissed before trial"). A district court generally has the discretion to retain or remand these claims if it subsequently dismisses the claims within its original jurisdiction. This discretionary authority gives the Court the discretion to remand rather than dismiss the plaintiff's state law claims. *Long v. Bando Mfg. of America*, 201 F.3d 754, 761 (6th Cir.2000)

The Court, in its discretion, remands Plaintiff's remaining claims, Counts I and II, to the Washtenaw County Circuit Court.

## CONCLUSION

For the reasons stated, the Court GRANTS IN PART and DENIES IN PART Defendants' motions for summary judgment. Specifically, the Court GRANTS summary judgment with respect to Counts III—VII of Plaintiff's Complaint and DENIES summary judgment with respect to Counts I and II of Plaintiff's Complaint. Furthermore, the Court, in its discretion, declines, pursuant to 28 U.S.C. § 1367(c), to exercise supplemental jurisdiction over Plaintiff's remaining state law claims, and REMANDS Counts I and II of Plaintiff's Complaint to the Washtenaw County Circuit Court.

SO ORDERED.